The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 29, 2019

## 2019COA132

### No. 16CA0651, *People v. Genrich* — Topical subject keywords

In the wake of a report funded by Congress and published by the National Academy of Science that calls into question the scientific method underlying toolmark identification, a division of the court of appeals considers whether a defendant is entitled to an evidentiary hearing based on newly discovered evidence.

A majority of the division, including a special concurrence, holds that the report — coupled with an affidavit of an expert witness applying the report to the toolmark evidence sustaining the defendant's conviction — is sufficient to warrant an evidentiary hearing under Crim. P. 35(c).

However, the dissent disagrees, concluding that the report and accompanying affidavit are not newly discovered evidence, but

rather unapplied academic theories — the content of which the defense essentially presented at trial, long before the report's publication.

The majority also concludes that the supreme court's decision in *Farrar v. People*, 208 P.3d 802 (Colo. 2009), did not announce a heightened standard for ordering a new trial based on newly discovered evidence. The special concurrence takes it a step further to state that, even if *Farrar* imposed a heightened standard, it applies only to victim recantation cases. The dissent counters these conclusions, asserting that *Farrar* declared that newly discovered evidence must be material such that it is affirmatively probative of innocence, and that the supreme court did not indicate that recantation should be treated differently than any other type of newly discovered evidence.

Finally, the special concurrence concludes, but the dissent disagrees, that due process concerns also entitle the defendant to an evidentiary hearing.

COLORADO COURT OF APPEALS                                    **2019COA132**

---

Court of Appeals No. 16CA0651
Mesa County District Court No. 92CR95
Honorable Richard T. Gurley, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Genrich,

Defendant-Appellant.

---

ORDER AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TAUBMAN
Berger, J., specially concurs
Tow, J., concurs in part and dissents in part

Announced August 29, 2019

---

Philip J. Weiser, Attorney General, Matthew S. Holman, First Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Cummins Krulewitch, Beth L. Krulewitch, Aspen, Colorado; Weil, Gotshal &
Manges, LLP, Irwin H. Warren, Edward Soto, New York, New York; M. Chris
Fabricant, Dana M. Delger, New York, New York, for Defendant-Appellant

¶ 1    Defendant, James Genrich, appeals the district court's denial of his Crim. P. 35(c) motion for postconviction relief. He contends that the district court erred in denying him an evidentiary hearing to prove allegations set forth in his motion and incorporated affidavit. In support of his argument, he points to a 2009 report, commissioned by Congress and published by the National Academy of Sciences, Nat'l Research Council of the Nat'l Acads., *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://perma.cc/8H3Q-S9SU (hereinafter NAS Report), that found toolmark identification evidence — which served as a linchpin in the prosecution's case against him — had not been scientifically validated. He also alleges that the district court violated his right to due process by admitting such evidence to support his conviction. In addition, he contends that the opinions of a forensic scientist, premised on extensive scholarship, review of the evidence, knowledge of contemporary scientific consensus, and authorship of the NAS Report, constitute newly discovered evidence that undermines confidence in the jury's verdicts. We agree in part and remand for a new evidentiary hearing.

¶ 2    Following oral arguments, we requested that the parties file supplemental briefs addressing (1) whether *Farrar v. People*, 208 P.3d 702 (Colo. 2009), establishes a new standard for granting a new trial based on a claim of newly discovered evidence; and, if so, (2) whether the proffered newly discovered evidence set forth in the petition for postconviction relief is affirmatively probative of Genrich's innocence.

## I. Law of this Case

¶ 3    Based on my opinion, Judge Berger's concurring opinion, and Judge Tow's partially dissenting opinion, we believe that the law of this case is as follows:

- The postconviction court's order denying Genrich's Crim. P. 35(c) motion is affirmed in part and reversed in part. It is affirmed as to all of Genrich's convictions other than his convictions for class 1 felonies. It is reversed as to the class 1 felonies, and the case is remanded to the postconviction court for an evidentiary hearing and for findings of fact and conclusions of law following the hearing.

2

- *Farrar v. People*, 208 P.3d 702, 706-07 (Colo. 2009), did not establish a heightened standard for Genrich's Crim. P. 35(c) newly discovered evidence claim. Instead, on remand the postconviction court should apply the supreme court's holdings in *People v. Rodriguez*, 914 P.2d 230, 292 (Colo. 1996); *People v. Gutierrez*, 622 P.2d 547, 559 (Colo. 1981); *People v. Scheidt*, 187 Colo. 20, 22, 528 P.2d 232, 233 (1974); and *Digiallonardo v. People*, 175 Colo. 560, 568, 488 P.2d 1109, 1113 (1971).

- This division has *not* made a determination whether the exclusion of O'Neil's testimony would likely result in an acquittal; that determination is for the postconviction court to make following the evidentiary hearing.

¶ 4    This division expresses no view as to whether Genrich ultimately is entitled to a new trial.

## II.  Background

¶ 5    Genrich was convicted of two counts of first degree murder, and multiple other felonies, arising from a series of pipe bombs detonated in Grand Junction, Colorado, in 1991.

¶ 6    In April 1989, law enforcement officers launched an investigation in connection with a pipe bomb discovered and disarmed in the parking lot of the La Court Motor Lodge in Grand Junction.  Investigators did not identify the perpetrator, and the case lay dormant until three pipe bombs exploded within months of each other in the spring of 1991.  The bombs — set off at the Two Rivers Convention Center, a residence, and the Feedlot Restaurant — left one injured and two dead, spurring terror in Grand Junction and a joint investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and local police.

¶ 7    ATF investigators connected the bombings to a serial bomber, with Genrich as their primary suspect.  They based their suspicions on reports of his unusual behavior, including his former employment at the convention center and his presence near the area of the explosion hours before the detonation of the first of the three 1991 bombs.  Investigators learned that Genrich had inquired at a local bookstore about the *Anarchist Cookbook* — a book that, among other things, contained instructions for manufacturing explosives.

¶ 8     Officer Robert Russell and ATF Agent Larry Kresl spoke with Genrich twice during the summer of 1991.  On both occasions, Genrich invited them into his one-room apartment in a boarding house and voluntarily answered their questions.  During the first conversation, Genrich indicated that he was aware of the bombs at the convention center and the Feedlot Restaurant, stating that he had heard the explosion at the Feedlot from his apartment, but that he did not know any details about the incidents.  Genrich also shared his background with Officer Russell and Agent Kresl.  He said he had studied electronics at DeVry Technical Trade Institute in Phoenix, Arizona, after he graduated from high school and continued to live in Phoenix for a time (including during April 1989, when the first pipe bomb was discovered).  Genrich explained that he had worked at the convention center but quit because there was not much work.  He denied ordering the *Anarchist Cookbook* but admitted that he was familiar with it because he had seen it in a Phoenix bookstore where he had worked.  When Officer Russell asked about his relationship with women, he said that he "gets upset with women easy."

¶ 9    During Genrich's second conversation with Officer Russell, and ATF Agents Kresl and Jeffrey Brouse, Genrich allowed the agents to search his room. The agents discovered two electrical Buss-type fuses and a handwritten note expressing anger, frustration, and threatening violence against women. Genrich admitted writing the note.

¶ 10   Based on this investigation, Officer Russell obtained and executed a search warrant for Genrich's apartment. During this formal search, he found a second note, similar to the first, also threatening to kill unspecified persons, as well as an electrical fuse, a pair of yellow-handled needle-nose pliers with wire cutters, metal wires, a plastic toolbox containing a soldering iron and green-handled pliers, a second toolbox containing yellow-handled pliers and other tools, a home and auto electrical repair kit, wire strippers, and an electrical circuit board. However, investigators did not find traces of gunpowder or other explosives; mercury switches; bombmaking instructions; or diagrams, drawings, or prototypes of plans to construct bombs.

¶ 11   While Officer Russell conducted his search of Genrich's apartment, Genrich agreed to speak with ATF Agent Debra Dassler.

She testified that he told her he had moved back to Grand Junction two and a half years earlier and that, since he had been back, he often walked around alone late at night. He also told her that he had attempted to order the *Anarchist Cookbook* at a bookstore to "piss the lady off at the bookstore."

¶ 12   During their conversation, he volunteered that he would not blow up the convention center because he had two friends who worked there. When she asked him what he thought the agents were looking for in their search of his apartment, he replied that they would probably take his electronics tools because they could be used to make a bomb.

¶ 13   He also said he knew that a bomb had exploded at a residence. He recognized the address but indicated that because he did not own a car, "it would be a long way for him to walk." Following the search, the items seized were sent to labs and ATF agents commenced round-the-clock, covert surveillance. However, at some point, Genrich realized that he was being watched and engaged ATF agents in conversation, insisting that he was not the bomber.

¶ 14    Meanwhile, Agent Brouse visited twenty-five hardware stores in the Grand Junction area to determine which stores carried pipe fittings, specifically "Coin brand end caps," which were used in the construction of the bombs. Agent Brouse found only one store carrying that brand of end caps, Surplus City; it was located five blocks from Genrich's apartment. An employee recalled having seen Genrich wandering the aisles where the galvanized pipe,[1] ammunition, and guns were stocked.

¶ 15    The surveillance of Genrich did not result in any inculpatory evidence. Further, no crime lab tests showed any trace of gunpowder or other explosive residue on Genrich's seized belongings, and no fingerprints were found on the bombs.

¶ 16    In an effort to obtain a confession, agents asked Genrich's parents to wear an electronic recording device to allow them to listen in on a rehearsed conversation with Genrich, which invited Genrich to admit that he had committed the crimes. However, Genrich denied involvement and instead expressed dismay that his

---

[1] Jerry Hill, the prosecution's expert witness in crime scene analysis and explosives analysis, testified that all three of the 1991 pipe bombs were made with galvanized steel.

mother and stepfather could believe he was capable of carrying out the bombings.

¶ 17    Based on the evidence described above, a grand jury indicted him on two counts of murder and related felonies.

¶ 18    The trial at which he was convicted took place in 1993.  The prosecution called two principal expert witnesses at trial, John O'Neil — an ATF expert in firearms and, as relevant here, toolmark identification — and Agent Jerry Taylor — an expert in bomb technology and explosives analysis.

¶ 19        O'Neil was qualified as an expert based on his on-the-job training as a firearms and toolmark examiner during lengthy employment with the ATF.  Although he lacked an advanced degree, he had testified as an expert approximately 465 times and used scientific techniques accepted at the time to identify toolmarks.[2]  O'Neil testified regarding the basis for his analysis of toolmarks, telling the jury that all tools possess unique identifiers at a microscopic level, and these unique characteristics imprint a signature mark on other substances, such as wire, that come into

---

[2] "Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object."  NAS Report, at 150.

9

contact with the tool. According to O'Neil, these signature marks enabled him to determine whether a particular tool made a particular mark. He explained that, during his examination, he must "figure out how that tool was used, how it was applied to the object. If it's a cutting type of tool, was it cut at an angle? Was it perpendicular to the object? Did he move it as he cut through the wire?"

¶ 20    He also told the jury that he was the first person in his field to distinguish the characteristics[3] for "cutting type" tools and "gripping type" tools. He further testified that, after determining to what class a tool belongs and how it was used, an examiner can microscopically determine whether a "suspect tool" was responsible for the striations made on a wire that are caused by the unique manufacturing marks left on the tool.

¶ 21    He further opined that he had never encountered a situation in which the mark left by a tool was not unique. He based this opinion on an experiment he had conducted by examining two tools

---

[3] O'Neil explained that certain observable characteristics of toolmarks, including the type, shape, and dimension of the impression, allow him to determine what type of tool was used to make the impression.

manufactured consecutively on the same assembly line. He observed that "although there [were] similarities between [the] two tools, it was very easy to determine that [the] marks that were left behind were entirely different."

¶ 22    He admitted that he had no background in statistical theory, inferential statistics, mathematical statistics, probability theory, experiment design, sampling methods, sampling techniques, quality control, or bias in experiment design. Nevertheless, he told the jury that he had identified three tools seized from Genrich's room — to the exclusion of *any other tool* — as the tools used in the creation of one or more of the bombs. The prosecution relied on O'Neil's testimony about "individualization" — the unique marks made by each cutting tool — to support its theory that Genrich constructed each of the bombs.

¶ 23    After O'Neil's testimony, Agent Taylor testified, based on his analysis of the unexploded 1989 bomb and reconstructions of the other three, that a serial bomber was responsible for all four bombs found in 1989 and 1991. Agent Taylor testified that, in his experience in examining 10,000 bombs, the four bombs in question

were unlike any he had seen, which led him to conclude they were made by the same person.

¶ 24    He further recounted that Surplus City — the store located a few blocks from Genrich's residence — carried all the items required to construct the bombs.

¶ 25    During closing arguments, the People focused on the interconnectedness of the detonations, relying on O'Neil's expert testimony:

- all four bombs were identically constructed;

- three specific tools — [Genrich's] needle-nose wire cutters, his wire strippers with the chip in the blade, and his yellow-handled pliers — were used to build the bombs; and

- Genrich was the *only* person who had possession of or access to those tools; he never loaned them to anyone.

¶ 26    The prosecutor added, "If you need further proof that all three of these are linked together, you get that from John O'Neil . . . [n]one of the 700 people who were in the Association of Firearms and Toolmark Examiners will say he's wrong."

¶ 27     To counter this expert testimony, the defense presented evidence that two of the four bombings appeared to have been aimed at specific targets apparently unknown to Genrich; law enforcement officials had not investigated alternate suspects who, unlike Genrich, had experience with explosives; Genrich lived in Phoenix at the time of the first explosion in 1989 and so could not have placed a bomb in Grand Junction then; and Genrich did not drive or own a car, making it difficult to transport and place the volatile explosive devices without detonation.

¶ 28     The jury returned guilty verdicts after four days of deliberation, convicting Genrich of two counts of first degree murder, three counts of use of an explosive or incendiary device in the commission of a felony, and one count of third degree assault.

¶ 29     Genrich directly appealed, and a division of this court affirmed.  The division specifically held that toolmark identification evidence was widely accepted by courts across the country and that the admission of O'Neil's opinions did not constitute error.  *People v. Genrich*, 928 P.2d 799 (Colo. App. 1996).

¶ 30     In February 2016, nearly two decades after the supreme court denied certiorari, Genrich moved under Crim. P. 35(c) for a new

13

trial based on newly discovered evidence. He supported his motion with an affidavit of a scientist who opined that years after Genrich's trial, scientists had concluded that there was no scientific basis for most of O'Neil's opinions. The expert relied on the 2009 NAS Report, which concluded that there was no scientific underpinning for the types of opinions given by O'Neil. Specifically, the report determined, among other things, that conclusions reached on the foundational theory of toolmark identification (used by O'Neil) — especially the association of evidence to a known source — had no basis in scientifically validated principles.

¶ 31    A sworn affidavit from Dr. Jay Siegel, a member of the committee that authored the NAS Report, explained that he could provide expert testimony to explain the relevance of the NAS Report to Genrich's case and relate it to the toolmark identification relied on by the prosecution. Dr. Siegel's affidavit stated that the NAS Report "calls into question whether the conclusion of individualization — the exclusive sourcing of a tool mark to one particular tool — is ever justified."

¶ 32    In his motion for a new trial, Genrich alleged that, because the sole evidence (Dr. Siegel's tool characterization) tying him to the

14

pipe bombs was faulty science now condemned nationally by forensic science experts, his conviction had been based on false evidence and was invalid. Genrich requested an evidentiary hearing on these issues, but by written order the district court denied his motion without a hearing.

¶ 33 In its order, the district court relied on several cases in which courts outside of Colorado had concluded that toolmark evidence, at least the marks left by a firearm, remained sufficiently reliable to justify its admission in a criminal trial. In applying the test for a new trial based on newly discovered evidence, the court concluded that Genrich's claims did not satisfy the third and fourth prongs of *People v. Muniz*, 928 P.2d 1352 (Colo. App. 1996). Applying *People v. Shreck*, 22 P.3d 68 (Colo. 2001), which established Colorado's test for the admission of expert testimony, the court concluded that both at the time of Genrich's trial and at the time the court decided Genrich's Crim. P. 35(c) motion, O'Neil's testimony remained sufficiently reliable to be presented to a jury. According to the court, the NAS Report and Dr. Siegel's opinions merely impeached O'Neil's opinions, and newly discovered evidence that is merely impeaching does not warrant a new trial under *Muniz*. Genrich

15

moved for reconsideration of the order denying his motion for a new trial, presenting a second affidavit from Dr. Siegel. In that affidavit Dr. Siegel distinguished firearm identification from toolmark identification, explaining that

> [s]ince there is only one way for a bullet to travel down the barrel of a gun, so long as the same weapon is used with the same type of ammunition, the markings on a bullet or cartridge will be relatively reproducible through many consecutive firings. Thus . . . there is some basis to express opinions regarding the probability that the subject gun fired the recovered evidence. The same is not true . . . where the tool at issue is . . . a common hand tool, such as a wire cutter. The marks made by a wire cutter are impacted by numerous variables that include the examiner's ability to replicate the exact manner in which the tool was used . . . .

The court, noting that nothing in Crim. P. 35(c) permits a motion for reconsideration, treated the motion for reconsideration as a C.R.C.P. 60(b) motion, and denied it, concluding that it was merely a reiteration of the original Crim. P. 35(c) motion.

### III. Preliminary Preservation Matters

¶ 34 Section 16-5-402, C.R.S. 2018, imposes a three-year time limitation for collateral attacks on felonies other than class 1

16

felonies.  (No time limit applies to challenges to convictions of class 1 felonies.)  If a defendant files a motion after the applicable time limit runs, he or she must assert justifiable excuse or excusable neglect.  *Id.*; *People v. Wiedemer*, 852 P.2d 424, 428 (Colo. 1993).  If no such exception is alleged, our review is limited to claims and allegations presented to the district court in the original Crim. P. 35(c) motion.  Therefore, we may not consider claims or allegations in a Rule 35(c) motion raised for the first time on appeal.  *People v. Stovall*, 2012 COA 7M, ¶ 3, 284 P.3d 151, 153.

¶ 35    With this standard in mind, we agree with the People that Genrich failed to set forth an exception to the time limitation imposed on his three convictions for the use of an explosive or incendiary device in the commission of a felony and his conviction for third degree assault.  Accordingly, we limit his challenge to his murder convictions.

¶ 36    We also agree that his argument regarding a 2016 report, President's Council of Advisors on Sci. & Tech., Exec. Office of the President, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), https://perma.cc/J3EA-QP7V, that purportedly undermines the

17

"degree of certainty to the exclusion of any other tool" and that O'Neil asserted in support of his theory of individualization was not preserved. *Stovall*, ¶ 3, 284 P.3d at 153. Therefore, we may not consider this report.

## IV. Validity of Expert Testimony Used to Convict

¶ 37 Genrich contends that the district court erred in denying him an evidentiary hearing. We agree with respect to his murder convictions.

## A. Standard of Review

¶ 38 We review de novo a postconviction court's decision to deny a Crim. P. 35(c) motion without holding an evidentiary hearing. *People v. Gardner*, 250 P.3d 1262, 1266 (Colo. App. 2010). A court may deny a Crim. P. 35(c) motion without a hearing only if "the motion and the files and record of the case" establish that the allegations lack merit and do not entitle the defendant to relief. Crim. P. 35(c)(3)(IV); *Kazadi v. People*, 2012 CO 73, ¶ 17, 291 P.3d 16, 22.

## B. Applicable Law

### 1. *Muniz*

¶ 39    While motions for a new trial based on newly discovered evidence are disfavored, in some cases injustice can only be avoided by granting a new trial. The bar to prevail on a motion for a new trial based on newly discovered evidence is high but not insurmountable. "Depending upon such things as the nature of the additional evidence, the circumstances of its discovery, and the strength of the existing evidence supporting conviction, we have at times highlighted different considerations in making the determination and have articulated the applicable standards in a variety of terms." *Farrar*, 208 P.3d at 706.

¶ 40    The traditional standard applied by Colorado courts to a motion for a new trial based on newly discovered evidence requires a defendant to show that (1) the evidence was discovered after trial; (2) the defendant and his attorney exercised due diligence to discover all possible favorable evidence prior to and during trial; (3) the newly discovered evidence is material to the issues involved and not merely cumulative or impeaching; and (4) the newly discovered

evidence is of such character as probably to bring about an acquittal if presented at another trial. *Muniz,* 928 P.2d at 1357.

## 2. *Farrar*

¶ 41　In *Farrar,* a case involving the recantation of testimony by a sexual assault victim, the supreme court stated that newly discovered evidence

> must be consequential in the sense of being affirmatively probative of the defendant's innocence, whether that is accomplished by helping to demonstrate that someone else probably committed the crime; that the defendant probably could not have committed the crime; or even that the crime was probably not committed at all.

*Farrar,* 208 P.3d at 707.

¶ 42　In his supplemental brief, the Attorney General argues that whatever the reach of the allegations in Genrich's postconviction motion, they are not affirmatively probative of his innocence.

¶ 43　We conclude that the above-quoted language in *Farrar* did not establish a new test for granting a motion for a new trial based on newly discovered evidence and that the test announced in *Muniz* remains the law.

20

### a. *Farrar* Did Not Announce a New Test

¶ 44     While the *Farrar* court stated that the new evidence must be affirmatively probative of the defendant's innocence, a careful reading of *Farrar* reveals that the court did not apply any such heightened test. The court actually applied the *Muniz* test set forth in *Digiallonardo v. People*, 175 Colo. 560, 567-68, 488 P.2d 1109, 1113 (1971), and *People v. Scheidt*, 187 Colo. 20, 22, 528 P.2d 232, 233 (1974).

¶ 45     Supporting this reading of *Farrar* is the following statement: "In addition to probably being believed by reasonable jurors, the witness's new version of events must be of such significance in its own right as to probably cause reasonable jurors to acquit the defendant." *Farrar*, 208 P.3d at 708. This language mirrors the traditional standard set forth in *Muniz* — "the newly discovered evidence is of such character as probably to bring about an acquittal verdict if presented at another trial." 928 P.2d at 1357. Further, the dissent in *Farrar* did not interpret the majority's opinion as articulating a new standard displacing *Muniz*; instead, it argued that the evidence there was of such significance as to probably bring about Farrar's acquittal on retrial. *Farrar*, 208 P.3d

21

at 710 (Bender, J., dissenting) ("The majority states that new impeachment evidence can justify a new trial only when it is of such significance that it would probably bring about an acquittal before a new jury.").

### b. Application of *Farrar* by Other Divisions

¶ 46 Since *Farrar*, divisions of our court have consistently applied the *Muniz* test. *See People v. Gee*, 2015 COA 151, ¶ 73, 371 P.3d 714, 725-26 (citing *Muniz* as the applicable standard to analyze whether newly discovered evidence warrants a new trial). Though two divisions of our court have cited the above-quoted language in *Farrar*, neither applied its "actual innocence" language.

¶ 47 In *People v. Hopper*, 284 P.3d 87 (Colo. App. 2011), the defendant was charged with two counts of possession of a controlled substance, two special offender sentencing counts, and one count of possession of a dangerous weapon in connection with a search of the vehicle in which the defendant was riding that uncovered firearms, drug paraphernalia, and drugs. *Id.* at 89. At trial, he argued that the other men he was riding with planted the illegal items in the vehicle — unbeknownst to him — and repositioned them to implicate him in the crime. *Id.* In a motion for

22

a new trial, the defendant offered newly discovered witness testimony from two inmates housed in the same facility as the men who purportedly framed the defendant for the crimes. *Id.* at 92-93. The inmates were prepared to testify that the other men had admitted allowing the defendant to "go[] down for something [one of the men] had done," one of the other men had transferred the guns and drugs into the vehicle, and the guns and drugs belonged to one of the other men. *Id.* at 93. The division concluded that none of the testimony offered was material or affirmatively probative of the defendant's innocence because, along with part of it being cumulative, the defendant's possession and ownership of the weapons and drugs were not at issue in the trial. Thus, the proffered evidence was not material under any standard because it would not have undermined the conviction.

¶ 48    Significantly, the *Hopper* division did not address whether the above-quoted *Farrar* language set forth a new standard. *Id.* at 92-93. Although the division cited the above-quoted *Farrar* language, it does not appear that it actually relied on it. Instead, it relied on three other grounds to dismiss the defendant's petition — the

proffered new evidence was cumulative, not probative of a matter at issue, and lacked any potential to undermine the conviction.

¶ 49    Similarly, in *People v. Poindexter*, the division cited the above-quoted language in *Farrar*, but ultimately applied the standard articulated in *Muniz*. 2013 COA 93, ¶¶ 44, 51, 338 P.3d 352, 360, 361.

¶ 50    Accordingly, we conclude that *Farrar* did not establish a new standard for motions for a new trial based on newly discovered evidence.

### C.  Analysis: *Muniz* Applies Here

¶ 51    Concluding that the standard articulated in *Muniz*, 928 P.2d at 1357, applies here, I must first determine what constitutes new evidence.  Academic theories may form the basis for an expert to interpret existing evidence.  *See People v. Bonan*, 2014 COA 156, ¶ 31, 357 P.3d 231, 236 (explaining that, while academic theories applied to existing evidence may form the basis for interpreting evidence, *unapplied* academic theories do not constitute evidence at all).  The new evidence must demonstrate sufficient materiality to suggest that, when considered with all evidence presented at trial, "a reasonable jury would probably conclude that there existed a

24

reasonable doubt as to defendant's guilt and thereby bring about an acquittal verdict." *People v. Tomey*, 969 P.2d 785, 787 (Colo. App. 1998); *see also Mason v. People*, 25 P.3d 764, 768 (Colo. 2001). We must consider this standard through the lens of the district court's threshold determination in a Crim. P. 35(c) motion: Can the defendant's petition for postconviction relief be denied without the benefit of an evidentiary hearing? It is the trial court's responsibility to determine the weight of the proffered evidence, and based on that, to conclude whether the evidence would probably result in acquittal if presented at another trial. Thus, if the facts alleged in the Crim. P. 35(c) motion, taken as true, may entitle the defendant to a new trial, the court must conduct an evidentiary hearing.

¶ 52    Scientific advances in forensic evidence have been the basis for new evidentiary hearings and new trials throughout the country. *See* Andrea Roth, *Safety in Numbers? Deciding When DNA Alone Is Enough to Convict*, 85 N.Y.U. L. Rev. 1130 (2010). Significantly, the United States Supreme Court has relied on the NAS Report's findings and analysis by other legal scholars, observing that "[s]erious deficiencies have been found in the forensic evidence used

in criminal trials." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009). Writing for the majority in *Melendez-Diaz*, Justice Scalia quoted the report's conclusion that "*[t]he forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.*" *Id.* (quoting NAS Report, at xx). The Court also pointed out that "[o]ne study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." *Id.* (citing Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 14 (2009)).

¶ 53 In *State v. Behn*, a New Jersey court recognized that a study calling into question an expert witness's opinion as to the uniqueness and source of bullet lead, conducted after the defendant's conviction, constituted new evidence entitling the defendant to a new trial. 868 A.2d 329, 344 (N.J. Super. Ct. App. Div. 2005).

¶ 54    I next turn to the question of whether the evidence could have been discovered prior to or during trial with due diligence. *Muniz*, 928 P.2d at 1357. However, for our purposes, a report issued nineteen years after a defendant's conviction indisputably could not have been discovered prior to or during the trial. Though Genrich proffered his own expert to rebut O'Neil's testimony, the toolmark identification methods used by O'Neil were generally accepted at the time.

¶ 55    Turning to the third and fourth prongs of the *Muniz* analysis, I address the questions of materiality and magnitude.

¶ 56    In *Farrar*, the supreme court declared that a witness's recantation necessarily impeaches the recanting witness's credibility; thus, witness recantation justifies a new trial only when it contradicts the prior testimony with a different and more credible account. 208 P.3d at 708. Similarly, in *Tomey*, a division of our court concluded that newly discovered evidence consisting of a victim's hearsay statement that was inconsistent with the victim's former testimony necessitated a new trial. 969 P.2d at 787. The division reasoned that the statement presented more than mere

impeachment evidence because, if believed, it would mean that the victim had lied about key facts at trial.  *Id.*

¶ 57 The *Behn* court applied an analysis similar to that required by *Muniz* and determined that the report at issue there demonstrated sufficient materiality because it called into question key evidence relied on at trial.  868 A.2d at 344.  In deciding whether the report was mere impeachment evidence, the court considered the test concerning materiality of undisclosed exculpatory evidence established in *Brady v. Maryland*, 373 U.S. 83 (1963).  *Id.* "Under the *Brady* standard, 'withheld evidence that is material may be that which impeaches a witness where the issue of the witness' reliability and credibility is crucial.'" *Id.* at 345 (quoting *State v. Henries*, 704 A.2d 24, 35 (N.J. Super. Ct. App. Div. 1997)). Concluding that the results of the study would have effectively neutralized the testimony of a key expert in the prosecution's case, the court determined that the study probably could have changed the jury's verdict.  *Id.*  It reasoned that "[w]hile the State's case, although circumstantial, was strong, it was 'far from overwhelming.'" *Id.* (quoting *State v. Ways*, 850 A.2d 440, 453 (N.J.

2004)).  Thus, the court granted a new trial based on the newly discovered evidence.  *Id.* at 346.

¶ 58    The Third and Ninth Circuits have also allowed a defendant to seek relief from convictions based on flawed forensic evidence by alleging a constitutional violation.  *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 (9th Cir. 2016); *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 162 (3d Cir. 2015); *Albrecht v. Horn*, 485 F.3d 103, 124 n.7 (3d Cir. 2007).  The *Han Tak Lee* court granted habeas corpus relief to a defendant based on new developments in the field of fire science that undermined the reliability of expert testimony about arson provided at the defendant's trial.  798 F.3d at 167.  There, the Third Circuit determined that the expert testimony on arson "constituted the principal pillar of proof tying [the defendant] to th[e] arson fire and the death of [the victim]," and the remaining evidence at his trial was insufficient to prove the defendant's guilt beyond a reasonable doubt.  *Id.* at 167-69.

¶ 59    Though we need not conclude here that forensic evidence later deemed flawed violates a defendant's constitutional rights, we find it instructive in connection with our analysis of whether newly discovered evidence based on the motion, files, and record, taken as

29

true, entitles a defendant to a new evidentiary hearing. *See* Crim. P. 35(c); *cf. Farrar*, 208 P.3d at 706 (stating that newly discovered evidence upsetting a guilty verdict does not implicate the constitutionality of a conviction, and declaring that the decision to grant a new trial based on new evidence instead rests on the "balance between the need for finality and the state's interest in ensuring the fairness and accuracy of its proceedings").

¶ 60    The affidavit based on the NAS Report, satisfies the first and second prongs of the *Muniz* test. The affidavit, applying the report to the facts of the case, provides relevant evidence that would be helpful to the jury, and the report's publication followed Genrich's convictions by almost two decades.[4]

---

[4] We recognize that the NAS Report does not render false all toolmark identification evidence; however, we conclude that its determination that the lack of precisely defined processes and specified standards sufficiently undermines the reliability of toolmark identification evidence to warrant an evidentiary hearing. The NAS Report concluded that more rigorous scientific studies to understand the reliability and the repeatability of these methods is required to "make the process of individualization more precise . . . ." NAS Report, at 154. Similarly, we do not conclude that at a hearing on Genrich's motion the trial court would or should determine that none of O'Neil's testimony would be admissible in the event of a retrial. The extent to which O'Neil could testify would be determined by the trial court.

¶ 61    Though Genrich's petition satisfies the first two prongs of the test for a motion for a new trial, the third and fourth prongs encompass the crux of the dispute.  The district court ruled that Genrich's proffered evidence was merely impeaching.  However, we conclude that the evidence offered bears similarity to the evidence alleged in *Behn*.  Though it may serve to impeach O'Neil's testimony, the proffered evidence, if believed, is of the sort that calls into question the reliability and credibility of a key witness.  Genrich's newly discovered evidence, as in *Behn*, may effectively neutralize the testimony of O'Neil, a key prosecution witness.

¶ 62    We also consider the test, announced in *Shreck*, 22 P.3d at 82-83, to determine the admissibility of expert testimony.  Specifically, we look to CRE 702 and the focus of the inquiry set forth in *Shreck* — whether the scientific principles underlying the expert's testimony are reliable.  *See People v. Wilkerson*, 114 P.3d 874, 877 (Colo. 2005).  The trial court may consider a multitude of factors in its consideration.[5]  Here, the evidence is akin to that proffered in

_____

[5] The supreme court emphasized that a trial court may consider the nonexclusive list of factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993): (1) whether the technique can and has been tested; (2) whether the theory or

*Han Tak Lee* and *Behn*.  Dr. Siegel's affidavit applying the NAS

Report offers peer-reviewed, scientifically accepted evidence that

counters O'Neil's testimony that furnished the principal evidence

connecting Genrich to the pipe bombs at trial.

¶ 63     Finally, I conclude that Genrich's allegations entitle him to an

evidentiary hearing to establish the fourth element of *Muniz* — that

his evidence is likely to bring about an acquittal if presented at a

new trial.  Without a developed record, we cannot hold that

Genrich's allegations, if true, are likely to bring about an acquittal,

but we conclude that they dramatically increase his chances of

obtaining an acquittal.  Once again, this is for the trial court to

determine following an evidentiary hearing.

¶ 64     Despite the People's reliance on *Bonan* to contend that

unapplied academic theories do not constitute evidence, let alone

newly discovered evidence under Crim. P. 35(c), we conclude that

*Bonan* is distinguishable.  There, a division of our court determined

---

technique has been subjected to peer review and publication; (3) the
scientific technique's known or potential rate of error, and the
existence and maintenance of standards controlling the technique's
operation; and (4) whether the technique has been generally
accepted.  *People v. Shreck*, 22 P.3d 68, 77-78 (Colo. 2001).

that the defendant's presentation of an academic theory, without having proffered an expert witness to testify as to the theory and relate it to the defendant's case, was not newly discovered evidence warranting a new trial. *Bonan,* ¶ 31, 357 P.3d at 236. Dr. Siegel's assertions in his affidavit apply the findings of the NAS Report to the circumstances of Genrich's case, thus differentiating the present facts from those of *Bonan.*

¶ 65    Moreover, it is probable that, as in *Han Tak Lee,* O'Neil's testimony tying Genrich's tools to the marks on the pipe bombs served as the prosecution's pillar of proof, and the other evidence presented at trial cannot, alone, sustain a conviction. In fact, the prosecutor's heavy reliance on O'Neil's toolmark identification during closing arguments demonstrates its significance to Genrich's murder convictions.

¶ 66    Most of the other evidence against Genrich was arguably insufficient to establish his guilt.[6] That evidence — including the

---

[6] We disagree with Genrich's statement that "the *sole* evidence connecting him to the deadly pipe bombs was the same type of faux-expert opinions discussed and condemned in the NAS report." As noted in the text, some circumstantial evidence supported his convictions.

notes and tools seized from his home, the locations of the bombs, his proximity to the hardware store that carried the bombmaking components, his familiarity with the *Anarchist Cookbook*, and his late-night walks around town — placed Genrich as a suspect but may not have sufficiently proved his guilt beyond a reasonable doubt. Here, Dr. Siegel's testimony could counter the prosecution's expert witness testimony that provided the *only* direct connection between Genrich and the pipe bombs. Genrich's Rule 35(c) allegations and proffered scientific evidence *have the potential* to weaken O'Neil's testimony about individualization, which the trial court could conclude would likely lead to an acquittal, given the lack of other direct evidence presented at trial. However, we need not determine the precise effect the newly discovered evidence would have on a jury in a new trial for us to remand to the trial court for an evidentiary hearing.

¶ 67 Given the proffered expert testimony presented in Genrich's Rule 35(c) motion, which, if true, would undermine the cornerstone of the prosecution's case, we conclude that Genrich is entitled to an evidentiary hearing.

## V.  Genrich's Due Process Argument

¶ 68    Because I conclude that Genrich is entitled to an evidentiary hearing under Crim. P. 35(c), I need not reach the question of whether the trial court deprived him of due process in denying his motion without a hearing.

## VI.  Conclusion

¶ 69    Accordingly, the order is reversed, and we remand to the district court for an evidentiary hearing.

JUDGE BERGER specially concurs.

JUDGE TOW concurs in part and dissents in part.

JUDGE BERGER, specially concurring.

¶ 70    I agree that James Genrich is entitled to an evidentiary hearing on his Crim. P. 35(c) motion.  But I cannot join Judge Taubman's opinion in full.  Therefore, I write separately to explain why Genrich is entitled to a hearing.

¶ 71    Genrich was convicted of multiple felonies, including murder, in connection with the detonations of three pipe bombs in Grand Junction, Colorado.  Years later, he moved for a new trial under Crim. P. 35(c), arguing that scientific developments since his trial demonstrated that expert testimony against him, which concluded that Genrich's tools were the only tools that could have made certain toolmarks left on the pipe bombs, was scientifically baseless.

¶ 72    The district court denied his motion without an evidentiary hearing.  Relying on cases from other jurisdictions, the court held that the weight of authority supported the admissibility of the toolmark identification testimony at the time of Genrich's trial, as well as today.

¶ 73    Because I conclude that, taking Genrich's factual allegations as true, the record does not clearly establish that Genrich was not

36

entitled to a new trial, I agree with the reversal of the postconviction court's denial of Genrich's Crim. P. 35(c) motion and the remand for an evidentiary hearing.

I.       Background

¶ 74       In April 1989, a pipe bomb was discovered in a motel parking lot in Grand Junction and disarmed by police.  The ensuing investigation did not identify the bomb maker.

¶ 75       In 1991, three pipe bombs were detonated in Grand Junction — the first in February, the second in April, and the third in June — killing two and injuring another.  Investigators recovered pieces of the detonated pipe bombs and concluded that there were multiple similarities between the 1989 bomb and each of the 1991 bombs, including that each detonator was powered by an electric battery and that each bomb's wiring was soldered to the battery.[1]

¶ 76       The investigators identified Genrich as a suspect based on a tip.  Investigators contacted Genrich twice, and on both occasions he invited them into his apartment.  During the second visit, with

---

[1] Investigators in this case included both local police officers and agents of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

Genrich's permission, the investigators conducted a search and recovered a handwritten note in which Genrich expressed his frustration with his interactions with women, stating, among other things, "[i]f I end up killing some stuckup bitch don't blame me," and "[t]hese bitches still won't even talk to me. If I can't be happy, I might as well kill one."

¶ 77 After this visit, investigators obtained and executed a search warrant for Genrich's apartment. From the apartment, investigators took into evidence various tools and equipment, including a pair of needle-nose pliers, a pair of wire strippers, a pair of slip-joint pliers, assorted wires, a soldering iron, two Buss-type fuses of the type used in the 1989 bomb, and a home and auto electrical repair kit.

¶ 78 Genrich was arrested and charged with first degree murder, use of explosives to commit a felony, and other related charges.

¶ 79 At trial, the prosecution presented, among other evidence, expert testimony from John O'Neil, a firearms toolmark examiner for ATF. O'Neil testified that based on general characteristics of toolmarks left on components of the pipe bombs, Genrich's tools were capable of making certain of those marks. O'Neil then went

further, testifying that based on his microscopic analysis and "to the exclusion of any other tool," a pair of needle-nose pliers taken from Genrich's apartment cut two of the wires used in the 1989 bomb, a pair of wire strippers taken from Genrich's apartment cut a wire used in the February 1991 bomb, and a pair of slip-joint pliers taken from Genrich's apartment were applied to fragments of the end caps from the April 1991 and June 1991 bombs (the individualization testimony). Prompted by the prosecutor, O'Neil clarified that "to the exclusion of any other tool" meant that "no other . . . tool could have made those toolmarks."

¶ 80 As the underlying basis for the individualization testimony, O'Neil stated that he had once examined two tools of the same make and model from the same assembly line and concluded that there were differences between the two. He also stated that in his many years as a toolmark examiner, he had never come across, or heard of, two tools being identical at a microscopic level so that they would leave the same marks.

¶ 81 The defense presented, among other evidence, expert testimony of Don Searls, a professor with a Ph.D. in statistics and expertise in experimental design, to rebut O'Neil's testimony. Searls

39

testified that the toolmark analysis conducted by O'Neil did "not have a scientific basis," and that, for the testing to be reliable, O'Neil would have needed to test multiple tools of the same make and wear without knowing which one belonged to Genrich, and have three other investigators perform the same blind test.

¶ 82 The jury convicted Genrich of two counts of first degree murder, multiple counts of use of an explosive or incendiary device in the commission of a felony, and third degree assault.

¶ 83 Genrich appealed on multiple grounds, and a division of this court affirmed, concluding that "experts in the use and analysis of tools have long been permitted to testify concerning the marks left by those instruments" and that Genrich's concerns regarding the reliability of O'Neil's testimony went to its weight rather than its admissibility. *People v. Genrich*, 928 P.2d 799, 802 (Colo. App. 1996) (*Genrich I*). The supreme court denied certiorari.

¶ 84 In 2016, Genrich moved for a new trial under Crim. P. 35(c) and requested an evidentiary hearing. He alleged that, after his trial, the relevant scientific community had concluded that toolmark individualization testimony was scientifically baseless because the underlying science had not been sufficiently tested and

40

validated. To support this claim, Genrich attached an affidavit from Dr. Jay Siegel, a former professor of forensic science and one of the authors of a 2009 report issued by the National Research Council, Nat'l Research Council of the Nat'l Acads., *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://perma.cc/8H3Q-S9SU (NAS Report), assessing the reliability of, among other forensic evidence, firearms and toolmark identification. In the affidavit, Dr. Siegel stated that a conclusion that a specific tool made a toolmark to the exclusion of all other tools was "unprovable" and had "no scientific support," citing the NAS Report to support his claims.

¶ 85 Genrich argued that this new understanding of the reliability of toolmark individualization testimony (1) demonstrated that he was convicted on the basis of unreliable forensic evidence in violation of the United States and Colorado Constitutions' Due Process Clauses and (2) constituted new evidence that required a new trial.

¶ 86 The district court denied the motion without a hearing, noting the division's holding in *Genrich I* and concluding that multiple courts outside of Colorado had considered the admissibility of

41

toolmark and firearms identification analysis in light of the NAS Report and had admitted that evidence.

¶ 87  Genrich moved for reconsideration, which the postconviction court also denied. He then filed this appeal.

## II.  Analysis

¶ 88  Genrich argues that the court erred when it denied his motion for a new trial based on newly discovered evidence and due process violations without holding an evidentiary hearing. I agree.

### A.  Preliminary Matters

#### 1.  Genrich's Challenges to Convictions for Felonies That Are Not Class 1 Felonies Are Time Barred

¶ 89  I agree with Judge Taubman's conclusion and analysis that Genrich's challenges to his convictions for felonies that are not class 1 felonies are time barred under section 16-5-402(1), C.R.S. 2018.

#### 2.  Genrich's Motion for a New Trial Can Be Dismissed Without an Evidentiary Hearing Only If the Record *Clearly Establishes* That He Is Not Entitled to Relief

¶ 90  It is important that we limit our focus to the question before us — whether the district court erred in denying Genrich's motion without an evidentiary hearing — rather than considering whether

42

Genrich's motion and affidavit, standing alone, entitle him to a new trial.

¶ 91    We review de novo a postconviction court's decision denying a Crim. P. 35(c) motion without holding an evidentiary hearing. *People v. Gardner*, 250 P.3d 1262, 1266 (Colo. App. 2010). "A court may deny a defendant's Crim. P. 35(c) motion without an evidentiary hearing 'only where the motion, files, and record in the case *clearly establish* that the allegations presented in the defendant's motion are without merit and do not warrant postconviction relief.'" *People v. Chalchi-Sevilla*, 2019 COA 75, ¶ 7 (emphasis added) (quoting *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003)). "But where the defendant alleges sufficient facts that, if true, *may warrant* relief, the court must conduct an evidentiary hearing." *Id.* (emphasis added).

¶ 92    Thus, the threshold for Genrich to establish that he is entitled to an evidentiary hearing is lower than the threshold to establish that he is entitled to a new trial. I conclude he meets that lower bar with respect to both claims.

## B. Genrich Is Entitled to an Evidentiary Hearing Based on his Newly Discovered Evidence Claim

¶ 93    Expert testimony constitutes potent evidence.  The imprimatur of the trial court in qualifying a witness to give expert testimony is powerful medicine and gives experts an "aura of trustworthiness and reliability" that few lay witnesses enjoy.  *People v. Cook*, 197 P.3d 269, 277 (Colo. App. 2008).  When later developments in science demonstrate convincingly that so-called expert opinions were nothing more than uninformed guesses or junk science, serious miscarriages of justice are possible.

¶ 94    Accordingly, to the extent that the partial dissent contends that advances in science can never be the basis for a new trial, I disagree.  The difficult question, however, is *when* such scientific advances rise to the level that requires a court to reassess a prior conviction rendered on such faulty evidence.  This case well illustrates the problem.

¶ 95    The partial dissent cites two cases in which courts rejected newly discovered evidence claims on the grounds that courts cannot retry cases every time a defendant is able to "find a credible expert with new research results," *Commonwealth v. LeFave*, 714 N.E.2d

44

805, 813 (Mass. 1999), or there is a new "'advancement' in scientific research," *State v. Gillispie*, Nos. 22877, 22912, 2009 WL 2197052, at *26 (Ohio Ct. App. July 24, 2009) (unpublished opinion). But those cases involved experts testifying based on new academic studies, of which there are presumably thousands produced each year.

¶ 96    The new evidence in this case is markedly different. It involves an alleged scientific consensus — evidenced by a federally mandated report representing the conclusions of dozens of experts in the field — and the application of that consensus to the evidence in this case by one of the report's authors. While there will always be new studies and scientific advances, the new evidence alleged in this case goes many degrees further.

¶ 97    So while I agree with the partial dissent that not every advance in science will justify a new trial decades after the conviction (and most advances certainly will not), this is not one of those cases that can be dismissed so easily.

### 1. The Evidence Alleged by Genrich Constitutes New Evidence for Purposes of Crim. P. 35(c)

¶ 98    The partial dissent would affirm the denial of Genrich's motion without an evidentiary hearing because the NAS Report is not new evidence for purposes of Crim. P. 35(c). I agree with the partial dissent that, standing alone, the NAS Report does not constitute new evidence. However, that is not the evidence at issue here.

¶ 99    Crim. P. 35(c)(2)(V) states that a convicted defendant may apply for postconviction review if

> there exists evidence of material facts, not theretofore presented and heard, which, by the exercise of reasonable diligence, could not have been known to or learned by the defendant or his attorney prior to the submission of the issues to the court or jury, and which requires vacation of the conviction or sentence in the interest of justice.

¶ 100   The "material fact[]" alleged by Genrich is that there is a consensus in the relevant scientific community that individualization testimony, like O'Neil's individualization testimony, is scientifically baseless. Crim. P. 35(c)(2)(V). The "evidence of [that] material fact[]" is an affidavit from one of the authors of the NAS Report, an indisputably well-qualified expert

46

witness, applying the NAS Report's conclusions to the individualization testimony in Genrich's case. *Id.*

¶ 101 That evidence is "new" because, although Genrich's lawyers vigorously attacked the reliability of O'Neil's individualization opinions and called their own expert (though not a toolmark expert) to attack the scientific basis and reliability of toolmark individualization opinions during trial in 1992, the alleged scientific consensus regarding the scientific validity of O'Neil's individualization testimony did not exist at that time.

¶ 102 Under the circumstances presented, even skilled cross-examination pointing out purported weaknesses in the underlying basis for an expert opinion and counter expert opinions challenging the scientific validity of expert opinions are hardly the same as the opinions (evidence) of one of the authors of a congressionally mandated study addressing forensic evidence.

¶ 103 Contrary to the partial dissent's and the Attorney General's position, the evidence at issue is not an unapplied academic theory like that in *People v. Bonan*, 2014 COA 156. In that case, the division stated that "[a]cademic theories merely form the basis for interpreting evidence when they are applied to existing evidence."

47

*Id.* at ¶ 31.  "Unapplied, academic theories do not constitute evidence" that would support a motion for a new trial.  *Id.*  The division concluded that four academic studies did not, in and of themselves, merit a new trial under Crim. P. 35(c) because Bonan "proffered no expert who ha[d] applied the theories he identified to the evidence presented at his trial."  *Id.* at ¶ 33.  I do not dispute *Bonan*'s holding.

¶ 104    Genrich, on the other hand, does not rely solely on the NAS Report; rather, he relies on the application of the NAS Report to the evidence in this case.  He submitted an affidavit by one of the authors of the NAS Report specifically applying the conclusions of the NAS Report to the type of toolmark individualization testimony presented against Genrich.[2]  In the affidavit, Dr. Siegel stated his understanding that an expert had testified that Genrich's tools were the tools used on certain pieces of the pipe bombs to the exclusion of all other tools in the world.  Dr. Siegel opined that this

---

[2] I do not consider the second affidavit of Dr. Siegel, filed with Genrich's motion for reconsideration, because it was not included with the Crim. P. 35(c) motion, and because motions for reconsideration of a denied Crim. P. 35(c) motion are not authorized by law.  *People v. Thomas*, 195 P.3d 1162, 1164 (Colo. App. 2008).

conclusion is "unprovable" and has "no scientific support." Thus,

Dr. Siegel's opinion is not an unapplied academic theory.

    2.    Standard for Prevailing on a Motion for a New Trial Based on Newly Discovered Evidence

¶ 105    The supreme court has, on multiple occasions, articulated what a defendant must show to warrant a new trial based on newly discovered evidence:

> (1)    "that the evidence was discovered after the trial;"
>
> (2)    "that defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial;"
>
> (3)    "that the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and"
>
> (4)    "that on retrial the newly discovered evidence would probably produce an acquittal."

*Rodriguez*, 914 P.2d at 292 (quoting *Gutierrez*, 622 P.2d at 559).

¶ 106    Contrary to the partial dissent's position, *Farrar*, 208 P.3d at 706-07, did not modify this standard by adding a requirement that the newly discovered evidence be "affirmatively probative of the

defendant's innocence." *Farrar* described the third and fourth

prongs of the existing standard as follows:

> We have also required that the newly
> discovered evidence must not only be relevant
> to material issues at trial but that it must also
> be of consequence to the outcome. Moreover,
> the newly discovered evidence must be of
> sufficient consequence for reasons other than
> its ability to impeach, or cast doubt upon, the
> evidence already presented at trial. It must be
> consequential in the sense of being
> affirmatively probative of the defendant's
> innocence, whether that is accomplished by
> helping to demonstrate that someone else
> probably committed the crime; that the
> defendant probably could not have committed
> the crime; or even that the crime was probably
> not committed at all. We have described the
> required materiality of newly discovered
> evidence, or the extent to which it must be
> consequential to the outcome, in various
> terms, with varying degrees of precision, but at
> least since *Digiallonardo*, we have specified
> that it must be such that it would probably
> produce an acquittal.

*Id.* (citations omitted).

¶ 107    A requirement that newly discovered evidence be affirmatively

probative of the defendant's innocence (an actual innocence

standard) significantly narrows the types of evidence that merit a

new trial. For instance, consider a scenario in which a defendant

was convicted of robbery solely on the basis of a video showing him

committing the robbery, and, after the conviction, new evidence was discovered demonstrating that the video was entirely fake. That evidence would not meet the partial dissent's affirmatively probative of innocence standard because, while it demonstrates that there was no basis for the conviction, it does not demonstrate that the defendant did not commit the crime.

¶ 108    There is no indication in *Farrar* that this was the court's intent. The *Farrar* court did not state that it was modifying the existing standard; rather, it repeatedly cited (and applied) *Rodriguez, Gutierrez, Scheidt*, and *Digiallonardo* — the cases setting out the existing standard that I (and Judge Taubman) rely on here. The *Farrar* court went on to discuss the existing standard's materiality requirement in greater detail, but did not restate or apply the "affirmatively probative" language. The opinion does not mention it again.

¶ 109    Not only does *Farrar* cite the existing standard and then apply it without reference to an actual innocence standard, it explicitly recognizes that it imposes no heightened requirement that the charges against the defendant actually be false or unfounded. *Farrar* contrasts the test it applies with the test applied when a

51

defendant who has pleaded guilty moves for withdrawal of that plea based on newly discovered evidence. That test differs from the existing standard applied in *Farrar only* because it applies an actual innocence standard. In order for such a defendant to successfully withdraw a guilty plea, the defendant must demonstrate that

> (1) the newly discovered evidence was discovered after the entry of the plea, and, in the exercise of reasonable diligence by the defendant and his or her counsel, could not have been earlier discovered; (2) *the charges that the People filed against the defendant, or the charge(s) to which the defendant pleaded guilty were actually false or unfounded*; and (3) the newly discovered evidence would probably bring about a verdict of acquittal in a trial.

*People v. Schneider*, 25 P.3d 755, 762 (Colo. 2001) (emphasis added).

¶ 110    The first and third prongs of the *Schneider* test parallel prongs of the *Gutierrez* test applied in *Farrar*. The distinguishing factor is *Schneider*'s requirement that the charges against the defendant who has pleaded guilty *actually be false or unfounded*. By recognizing that *Schneider* set out a new standard "applicable only to convictions resulting from guilty pleas," the *Farrar* court established

that there is no similar requirement for defendants who, like *Genrich*, went to trial.[3]

¶ 111 The partial dissent contends that the difference highlighted by *Farrar* between the two tests is instead that *Schneider* requires *proof* of actual innocence, whereas *Farrar* only requires that the evidence *support* actual innocence. I think this makes too fine a distinction.

¶ 112 Furthermore, although we are typically reluctant to rely on a dissenting opinion's interpretation of a majority opinion, the dissent in *Farrar* is instructive because it makes the same distinction between the standard applied by the majority and the standard applicable in a case in which a defendant seeks to withdraw a guilty plea based on new evidence, recognizing that such a defendant bears a "higher burden." *Farrar*, 208 P.3d at 711 (Bender, J., dissenting) (quoting *Schneider*, 25 P.3d at 761).

---

[3] Two later Colorado Court of Appeals cases cite the "affirmatively probative of . . . innocence" language from *Farrar v. People*, 208 P.3d 702, 707 (Colo. 2009). One, *People v. Poindexter*, 2013 COA 93, does not apply that language. The other, *People v. Hopper*, 284 P.3d 87, 92-93 (Colo. App. 2011), does so without needing to. Without considering whether the testimony at issue was affirmatively probative of innocence, that testimony was not material because it lacked any potential to undermine the conviction.

¶ 113　In addition, facts and context matter.  The *Farrar* court engaged in extensive discussion regarding the unique nature of victim recantations as the basis for newly discovered evidence claims, noting "the concerns inherent in the recantation of an alleged incest or child sexual assault victim," "the suspicion with which recantations should be examined," and "the court's role in making an objective assessment of the recanting witness's credibility."  *Farrar*, 208 P.3d at 707.  The *Farrar* court went on to describe in detail the materiality standard applicable in victim recantation cases.  To the extent *Farrar* imposed a heightened materiality standard requiring an actual innocence claim, that heightened standard only applies in victim recantation cases.

### 3. The Record Does Not Clearly Establish That Genrich's Newly Discovered Evidence Motion Would Fail

¶ 114　Taking Genrich's factual allegations as true, the record does not "clearly establish" that Genrich has not met the standard set out in *Rodriguez, Gutierrez,* and earlier precedent, and therefore those allegations, if true, "may warrant relief."  *Chalchi-Sevilla,* ¶ 7.

¶ 115　First, the new evidence alleged was discovered after trial because the scientific consensus alleged by Genrich did not emerge

54

until years after his conviction. Second, for the same reason, no amount of due diligence on the part of Genrich and his counsel could have discovered this evidence before trial.

¶ 116 Third, the new evidence alleged is material to the issues involved because it would gut the strongest evidence supporting Genrich's conviction — the individualization testimony. It is not cumulative because, although Genrich did present the testimony of a statistician at his trial that O'Neil's methods were not scientifically reliable, the testimony of a single defense expert with admittedly no experience in toolmarks is decidedly different in character and impact than a report of the National Research Council that represents the conclusions of dozens of experts in the field and the testimony of one of its authors applying those conclusions specifically to the evidence in this case.

¶ 117 The alleged new evidence does more than impeach O'Neil's individualization testimony because it is relevant not only to credibility, but also reliability. Credibility determinations are a function of the jury. *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1166 (Colo. App. 2010). Reliability determinations are at least initially a function of the court, and for expert testimony to

be admissible, the court must conclude the scientific principles underlying it are reliable under CRE 702. *Kutzly v. People*, 2019 CO 55, ¶¶ 10-12. This determination is separate and apart from any attempt by a party to impeach a witness. If the trial court determines under CRE 702 that the opinions are unreliable, the jury would not hear them at all.

¶ 118 Fourth, because, taking the allegations in Genrich's motion as true, the alleged new evidence would likely result in the exclusion of O'Neil's individualization testimony, it would significantly increase the probability of an acquittal.

### a. Based on the Alleged New Evidence, the Individualization Testimony Would Not Be Admissible

¶ 119 To determine whether scientific or other expert testimony is admissible under CRE 702, the court should "focus on the reliability and relevance of the proffered evidence" and must make determinations as to "(1) the reliability of the scientific principles, (2) the qualifications of the witness, and (3) the usefulness of the testimony to the jury." *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001).

56

¶ 120    First, accepting Genrich's allegations as true, there were at the time of trial, and there are now, *no* scientific principles underlying O'Neil's individualization testimony.  Therefore, based on a straightforward application of CRE 702, O'Neil's individualization opinions are not reliable, and that testimony is inadmissible.[4]

¶ 121    I disagree with the district court's conclusion that "the weight of authority from other jurisdictions holds that toolmark identification testimony is reliable despite the criticisms stated in the NAS Report."  Each of the cases relied upon by the district court dealt with matching bullets and cartridge casings to a specific firearm.  *United States v. Adams*, No. 15-CR-0106 (PJS/FLN), 2016 WL 424967 (D. Minn. Feb. 3, 2016); *United States v. Ashburn*, 88 F. Supp. 3d 239, 243-44 (E.D.N.Y. 2015); *United States v. Otero*, 849 F. Supp. 2d 425, 438 (D.N.J. 2012), *aff'd*, 557 F. App'x 146 (3d Cir. 2014); *People v. Robinson*, 2 N.E.3d 383, 395-402 (Ill. App. Ct.

---

[4] I do not address, because it is not implicated by the evidence alleged by Genrich, whether some form of less conclusive testimony as to the relationship between the tools and the marks, such as, "I cannot conclude, based on this evidence, that these tools did not make these marks," would be admissible.

2013); *Commonwealth v. Pytou Heang*, 942 N.E.2d 927, 937-38 (Mass. 2011).

¶ 122    With respect to ballistics opinions, numerous courts have prohibited experts from testifying that bullets or cartridge casings were fired from a specific firearm to the exclusion of all other firearms in the world.  *E.g., Ashburn*, 88 F. Supp. 3d at 249; *United States v. Taylor*, 663 F. Supp. 2d 1170, 1180 (D.N.M. 2009); *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008); *United States v. Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006) ("Because an examiner's bottom line opinion as to an identification is largely a subjective one, there is no reliable statistical or scientific methodology which will currently permit the expert to testify that it is a 'match' to an absolute certainty, or to an arbitrary degree of statistical certainty.").  The courts in those cases concluded that such testimony lacked scientific reliability.

¶ 123    More importantly, none of the cases relied on by the district court involved marks left by a hand tool, and the Attorney General has cited no cases since the release of the NAS Report involving marks left by a hand tool.  Similarly, while *Genrich I* previously concluded that the analysis of marks left by hand tools was reliable

58

based on existing precedent from other jurisdictions, the division's opinion predated the alleged scientific consensus damning toolmark individualization evidence.

¶ 124    Opinions from other jurisdictions concluding that firearms identification testimony is admissible bear little weight here because of the differences between toolmark identification analysis for firearms and hand tools.  The analysis of toolmarks left on a surface by a hand tool is inherently more subjective than the analysis of toolmarks left by a gun on bullets or cartridge casings.  While a gun fires in the same manner each time, there is significantly more variability in the application of a hand tool, including the angle at which it is applied, the portion of the blade used, and the force with which it is applied.

¶ 125    Examiners of toolmarks created by hand tools, as opposed to those examining bullets and cartridge casings, set out to recreate the particular way in which a tool was applied to a surface.  While a gun need only be fired once to recreate the markings it would leave on a bullet, a toolmark examiner might need to make dozens of test cuts (as was the case here) in order to create a cut that the

examiner believes matches, introducing further layers of subjectivity and variability.

¶ 126    Continued reliance on precedents that predate the development of an alleged scientific consensus regarding the reliability of toolmark individualization testimony runs the risk of "grandfathering in irrationality." *United States v. Green*, 405 F. Supp. 2d 104, 123-24 (D. Mass. 2005) (excluding expert testimony that a specific gun fired a bullet to "the exclusion of all other guns"). I decline the Attorney General's invitation to do so.

¶ 127    Second, again accepting Genrich's allegations as true, there are no expert qualifications that would render someone competent to testify that only one tool in the world could have made a certain mark. And finally, expert testimony that is unreliable has no probative value, and therefore would not be useful to a jury.

b.    I Cannot Conclude That Genrich Would Be Convicted Without the Individualization Testimony

¶ 128    On the present record, it is impossible for us to determine whether exclusion of the toolmark individualization testimony would likely result in an acquittal. O'Neil testified over a period of several days, expressing multiple opinions. Some of those opinions

undoubtedly would withstand the attack made by Genrich, while the individualization opinions probably would not. Without a full analysis of all of O'Neil's testimony (as well as the other toolmark expert who testified at trial), I cannot reach a conclusion whether the exclusion of some or all of this testimony likely would have resulted in an acquittal. This determination must be made, at least in the first instance, by the postconviction court after an evidentiary hearing.

¶ 129 The determination of whether newly discovered evidence would probably bring about an acquittal "should be premised on whether the new evidence, as developed in trial, when considered with all the other evidence, is such that a reasonable jury would probably conclude that there existed a reasonable doubt as to defendant's guilt and thereby bring about an acquittal verdict." *Rodriguez*, 914 P.2d at 292.

¶ 130 Turning to the evidence here and excluding the individualization testimony, the prosecutor introduced the following evidence:

> (1)    there were numerous similarities between the four pipe bombs, including that each lacked a safety mechanism,

was a booby-trap device triggered by movement, was powered by a battery with wires soldered to it, used the same type of powder, and used Coin brand end caps;

(2)     Genrich lived within easy walking distance of the locations where two of the three 1991 pipe bombs were detonated;

(3)     Genrich had been seen near some of the areas where the 1991 bombs were detonated;

(4)     Genrich had threatened in the past to kill people out of frustrations with women and a perceived lack of respect;

(5)     Genrich was familiar with the *Anarchist Cookbook*, which includes descriptions of how to make bombs;

(6)     Genrich lived five blocks from, and was seen in, Surplus City, the only hardware store of twenty-five in the area to carry the type of Coin brand end caps used in the bombs;[5]

---

[5] Law enforcement agents who conducted the search testified to this.  The Coin brand end caps recovered were not in evidence at trial.

(7) two Buss-type fuses were recovered from Genrich's apartment, and that is the type of fuse used in the 1989 bomb;

(8) the bombs employed an electronic detonation system, and Genrich was familiar with electronics from coursework at DeVry Technical Trade Institute; and

(9) Genrich had tools capable of making the marks that appeared on certain of the wires and caps used in the bombs.[6]

¶ 131 Countering the prosecutor's case, Genrich introduced evidence that

(1) he was in Phoenix working at a bookstore when the 1989 bomb was placed;[7]

---

[6] I am concerned that Genrich's attorney ignores virtually all this evidence. His contention that the only evidence of guilt was O'Neil's opinion testimony is demonstrably untrue.

[7] Evidence included testimony of Genrich's coworkers in Phoenix at the time, a timesheet from his place of employment with handwritten entries from the bookstore's employees, and a record of books returned to the publisher filled out by Genrich on April 14, 1989, the date the first pipe bomb was discovered in Grand Junction.

(2)     he was at his mother and stepfather's house when each of the 1991 bombs detonated;[8]

(3)     there was no gunpowder residue found at Genrich's apartment or his mother and stepfather's house, and Genrich did not rent a storage unit in the area;

(4)     two other toolmark examiners reviewed O'Neil's work and were able to confirm only one of the matches identified by O'Neil, agreeing that the other purported matches were inconclusive;

(5)     the highly hazardous nature of the bombs (detonated by movement without a safety switch) suggested that the maker had bombmaking expertise, which, beyond testimony that Genrich was familiar with *the Anarchist Cookbook*, there is no evidence Genrich had;

---

[8] Both Genrich's mother and stepfather testified to this and provided documentary evidence corroborating portions of their testimony.

64

(6) the only end caps available at Surplus City from a period in 1990 through the time the bombs were detonated were not Coin brand;[9]

(7) there were multiple alternate suspects familiar with building explosives; and

(8) there was a white vehicle seen at each of the 1991 bombings, and Genrich did not own or have access to a vehicle.

¶ 132    I conclude that in light of all the evidence, if O'Neil's individualization testimony were excluded as the result of the new evidence alleged, the record does not clearly establish that Genrich would probably still be convicted.

C.    Genrich Is Entitled to an Evidentiary Hearing on the Basis of His Due Process Claim

¶ 133    In his motion for a new trial, Genrich contended that the "jury's verdicts were based on what we now know to be unreliable forensic evidence, in violation of both the Colorado and United

---

[9] The Surplus City employee responsible for ordering this kind of part testified that the end caps were slow sellers, and therefore he knew from his records that the only end caps in stock from the time he ordered them in 1990 until after the bombings were the non-Coin brand type.

States Constitutions." I conclude that Genrich has alleged facts that warrant an evidentiary hearing because the record does not "clearly establish," *Chalchi-Sevilla,* ¶ 7 (quoting *Ardolino,* 69 P.3d at 77), the absence of a due process violation, and his allegations "may warrant relief," *id.*

¶ 134 Crim. P. 35(c)(2)(I) authorizes postconviction review when "the conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States or the constitution or laws of this state."

¶ 135 Colorado appellate courts have not previously considered whether the admission of scientifically unreliable expert testimony results in a due process violation. However, in *Han Tak Lee v. Houtzdale SCI,* 798 F.3d 159, 166 (3d Cir. 2015) (quoting *Han Tak Lee v. Glunt,* 667 F.3d 397, 403 (3d Cir. 2012)), the Third Circuit Court of Appeals held that the admission of scientifically unreliable expert testimony would violate due process guarantees if the "expert testimony undermined the fundamental fairness of the entire trial because the probative value of [that] evidence, though relevant, [was] greatly outweighed by the prejudice to the accused from its

admission." The Ninth Circuit Court of Appeals adopted this approach in *Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016).

¶ 136 Habeas relief for a due process violation is not available, however, if there was "ample other evidence of guilt." *Glunt*, 667 F.3d at 407 n.13 (quoting *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007)).

¶ 137 I conclude that Colorado law recognizes the due process claims recognized by both the Third and Ninth Circuits.

¶ 138 Given the significant potential for O'Neil's expert individualization testimony to have swayed the jury to convict Genrich, I consider the elements of the *Han Tak Lee* test and conclude that Genrich's due process claims warrant an evidentiary hearing.

### 1. *Han Tak Lee*

¶ 139 In *Han Tak Lee*, 798 F.3d at 161, a jury convicted a father of first degree murder and arson after his daughter died in a house fire. At trial, the prosecutor relied heavily on "fire-science and gas-chromatography evidence" introduced through expert testimony. *Id.* at 161-62. Years later, the father filed a petition for habeas corpus arguing that his conviction violated due process because the

expert testimony had been based on what he claimed was unreliable science. *Id.* at 162.

¶ 140 The federal district court denied the petition, but the Third Circuit reversed. *Id.* The father then prevailed on remand following an evidentiary hearing. *Id.* The district court concluded that "the admission of the fire expert testimony undermined the fundamental fairness of the entire trial" because the verdict "rest[ed] almost entirely upon scientific pillars which have now eroded." *Id.* (quoting *Han Tak Lee v. Tennis*, No. 4:08-CV-1972, 2014 WL 3894306, at *15-16 (M.D. Pa. June 13, 2014)).

¶ 141 The district court also concluded, despite the fact that the Commonwealth of Pennsylvania had introduced evidence that the father had strangled his daughter before the fire, had shown little grief after the incident, and had provided conflicting accounts of the fire, that the Commonwealth had failed to demonstrate that there was ample other evidence of guilt. *Id.* The Third Circuit affirmed.

## 2. Due Process Violation

¶ 142 Assuming the truth of Genrich's allegations in his Crim. P. 35(c) motion, the prejudicial effect of the individualization testimony significantly outweighs its probative value. The individualization

68

testimony was allegedly scientifically baseless and therefore, as discussed above, had no probative value. It was highly prejudicial because (1) it was the strongest piece of evidence against Genrich; (2) it was offered by an expert witness whose opinion, as an expert witness for the State, bore an "aura of trustworthiness and reliability" not typically afforded that of lay witnesses, *Cook*, 197 P.3d at 277; and (3) the prosecutor relied heavily on the individualization testimony in opening statement and closing argument.

### 3. Ample Other Evidence of Guilt

¶ 143 As discussed above, I disagree with Genrich that the "sole evidentiary basis" for his conviction was the individualization testimony. However, whether there was ample other evidence of his guilt such that he would not be entitled to, at the very least, an evidentiary hearing is a closer question. As detailed above, both the prosecutor and Genrich introduced significant evidence apart from the individualization testimony.

¶ 144 The partial dissent takes the position that because there is *some* other evidence of Genrich's guilt, his due process claim must be rejected. But that is not the test. There must be "*ample* other

evidence of guilt." *Han Tak Lee*, 798 F.3d at 166 (emphasis added) (quoting *Glunt*, 667 F.3d at 407 n.13). Further, in order to reject the due process claim without an evidentiary hearing, the record must "*clearly establish*" that there is ample evidence of guilt. *Chalchi-Sevilla*, ¶ 7 (emphasis added) (quoting *Ardolino*, 69 P.3d at 77). I conclude it does not. The ultimate determination of whether ample other evidence of guilt was presented is for the postconviction court on remand after an evidentiary hearing.

¶ 145 Finally, the partial dissent seems to contend that Genrich has not alleged deficiencies in the expert testimony that would constitute a due process violation. I disagree because Genrich's undeniable base contention is that the individualization testimony is scientifically unreliable, and multiple courts have concluded that the admission of such unreliable testimony can constitute a due process violation. *Gimenez*, 821 F.3d at 1145; *Han Tak Lee*, 798 at 161. Such a due process claim, unlike a new evidence claim under the partial dissent's reading of *Farrar*, "does not require a showing of innocence." *Han Tak Lee*, 798 F.3d at 162. Thus, Genrich's due process claim entitles him to an evidentiary hearing.

70

### III. Conclusion

¶ 146    I vote to reverse the postconviction court's order in part and to remand to that court for an evidentiary hearing on Genrich's Crim. P. 35(c) motion as it pertains to his class 1 felony convictions.

JUDGE TOW, concurring in part and dissenting in part.

¶ 147     A quarter century after his conviction for multiple counts of murder and other crimes stemming from a bombing spree, James Genrich seeks a new trial, asserting newly discovered evidence. His motion for a new trial, filed in 2016, is based on a 2009 report of the National Academy of Sciences, Nat'l Research Council of the Nat'l Acads., *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://perma.cc/8H3Q-S9SU (the NAS Report) — which concluded that much of the forensic science relied upon by law enforcement officials throughout the country lacked sufficient scientific validation studies — and a proffered expert witness's opinion purporting to explain the impact of the NAS Report on Genrich's case. The majority concludes that Genrich's allegations are sufficient to warrant a hearing on his motion for a new trial on the class 1 felony charges. Because I believe that Genrich's proffered evidence, as a matter of law, is neither new nor of sufficient consequence to the outcome to meet the threshold for obtaining a new trial, I respectfully dissent in part.[1]

---

[1] I agree with both of my colleagues that any claim for a new trial on the lesser felonies is time barred. § 16-5-402, C.R.S. 2018. *See*

## I. Background and Applicable Law

¶ 148    As a threshold matter, I agree with, and adopt without repeating, Judge Berger's recitation of the factual and procedural background in this matter. *Supra* ¶¶ 75-84 (Berger, J., specially concurring). I also agree with both of my colleagues' recitations of the four elements a defendant must show to obtain a new trial based on newly discovered evidence. *Supra* ¶ 41 (majority opinion); ¶ 106 (Berger, J., specially concurring). This, however, is where I part company with my colleagues, because in my view, Genrich has failed to sufficiently set forth allegations that entitle him to a hearing on his motion for new trial.

## II. The NAS Report

¶ 149    The NAS Report was the result of a study commissioned in 2005 by Congress, which had recognized the need for significant improvements in the nation's forensic science system. NAS Report, at xix. Specifically, by statute, Congress "direct[ed] the Attorney General to provide [funds] to the National Academy of Sciences to

---

*People v. Stovall,* 2012 COA 7M, ¶ 37. Thus, I concur in that portion of the decision.

73

create an independent Forensic Science Committee." S. Rep. No. 109-88, at 46 (2005); *see* Act of Nov. 22, 2005, Pub. L. No. 109-108, 119 Stat. 2290. That committee then studied numerous forensic science disciplines, including biological evidence, analysis of controlled substances, friction ridge analysis, hair and fiber analysis, shoe print and tire track impressions, forensic odontology, bloodstain pattern analysis, and (relevant to this dispute) firearms and toolmark identification. After a lengthy study, the committee issued the NAS Report.

¶ 150 The report describes toolmarks as follows: "Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used . . . ." NAS Report, at 150. Toolmark identification focuses on both "class characteristics" and "individual characteristics" of tools. The former are "distinctive features that are shared by many items of the same type." *Id.* at 152. This would include things like "the width of the head of a screwdriver or the pattern of serrations in the blade of a knife . . . common to all screwdrivers or knives of a particular manufacturer

and/or model." *Id.* Individual characteristics, on the other hand, are "the fine microscopic markings and textures that are said to be unique to an individual tool." *Id.*

¶ 151 The committee studied how the process of toolmark identification is undertaken and reported on the shortcomings in the interpretation of toolmarks. For example, the committee noted that it was "not able to specify how many points of similarity are necessary for a given level of confidence in the result." *Id.* at 154. Further, the committee expressed concern regarding the "heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability." *Id.* at 155. Ultimately, the committee concluded that "[s]ufficient studies have not been done to understand the reliability and repeatability of the methods." *Id.* at 154.

¶ 152 Notably, however, the committee did not opine that the discipline could never or would never be established as reliable. Indeed, the committee acknowledged that "class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark," and that "[i]ndividual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one

particular source." *Id.* Rather, the NAS Report merely concluded that "additional studies should be performed to make the process of individualization more precise and repeatable." *Id.*

### III. The Motion for a New Trial

¶ 153 Genrich argues that the NAS Report is new evidence, was not obtainable prior to his trial, is material and not merely cumulative or impeaching, and would probably produce an acquittal. In my view, even taking his factual allegations as true, Genrich's motion fails to establish that he is entitled to a new trial, or even to an evidentiary hearing.

### A. The NAS Report Is Not New Evidence

¶ 154 Implicit in the first two prongs of the test — that the evidence was discovered after trial, and not before trial despite the exercise of due diligence by a defendant and his or her counsel — is the requirement that the evidence must actually be new. The information in the NAS Report is neither evidence nor new.

¶ 155 As a division of this court has previously held in another context, "[a]cademic theories merely form the basis for interpreting evidence when they are applied to existing evidence." *People v. Bonan*, 2014 COA 156, ¶ 31. "Unapplied, academic theories do not

76

constitute evidence." *Id.* Genrich has not proffered any testimony or evidence that would apply the purportedly new scientific information in the NAS Report to the circumstances of this case. Instead, he proffers an affidavit from Jay Siegel (a member of the committee that wrote the 2009 NAS Report), in which Siegel merely recites the conclusion of the report: that the forensic science of toolmark identification "has not been sufficiently studied nor scientifically validated." At no point in the affidavit does Siegel opine that Genrich's tools did not make the marks on the bomb parts.[2]

¶ 156    The affidavit attached to Genrich's motion for new trial is not evidence. *See Commonwealth v. LeFave,* 714 N.E.2d 805, 813 (Mass. 1999) (holding that to treat expert testimony relying on studies released after trial as evidence "would provide convicted defendants with a new trial whenever they could find a credible

_____

[2] Though Genrich submitted a supplemental affidavit to the trial court as part of a motion to reconsider, neither the trial court nor this court is required to consider information first presented in a motion to reconsider. *See Fox v. Alfini,* 2018 CO 94, ¶ 36. In fact, where, as here, the motion to reconsider merely advanced the same arguments in the original postconviction petition, it is essentially a successive petition and will not be considered. *See People v. Thomas,* 195 P.3d 1162, 1165 (Colo. App. 2008).

expert with new research results supporting claims that the defendant made or could have made at trial"); *State v. Gillispie,* Nos. 22877, 22912, 2009 WL 2197052, at *26 (Ohio Ct. App. July 24, 2009) (unpublished opinion) ("A case cannot be retried based on every 'advancement' in scientific research."). Notably, both *LaFave* and *Gillespie* were cited with approval in *Bonan,* ¶ 35.

¶ 157 Nor is the information new. Again, the gravamen of the report is that "[s]ufficient studies have not been done to understand the reliability and repeatability of the methods." NAS Report, at 154. In other words, the report concludes that the science of toolmark identification lacks a sufficient scientific method and basis. In his motion for new trial and the accompanying affidavit, Genrich and his expert, Siegel, parrot this conclusion, arguing that the forensic science of toolmark identification "has not been sufficiently studied nor scientifically validated."

¶ 158 Significantly, the jury heard this exact evidence during Genrich's trial. Genrich presented an expert witness in scientific methods. The defense expert pointed out that there were no data banks supporting the assumption that each tool is unique, there had been no experiments conducted to determine the probability of

misidentification of a tool, the toolmark examiner's opinion was subjective, the toolmark analysis process has no scientific basis, and the fact that the test was not conducted in a blind fashion exposed the conclusion to confirmation bias by the examiner. The prosecution offered no evidence to the contrary.

¶ 159    Because Genrich's motion offers only unapplied academic theories, and in any event the jury heard and had the opportunity to consider essentially the same information as that presented in the NAS Report, Genrich has not presented any new evidence. Thus, because he has failed to sufficiently allege that new evidence exists, he cannot be entitled to a hearing on whether this information would warrant a new trial.

¶ 160    Indeed, for the same reason, he has failed to sufficiently allege facts that, if true, would establish the second prong. In one iteration of the second prong, our supreme court has stated that the evidence must be "unknown to the defendant and his counsel in time to be meaningfully confronted at trial and unknowable through the exercise of due diligence." *Farrar v. People*, 208 P.3d 702, 706 (Colo. 2009). Genrich's purportedly new evidence was not only knowable, but known to Genrich's counsel, who developed and

79

presented it to the jury in a meaningful confrontation of the prosecution's expert. Thus, again, even taking the allegations as true, the motion fails to set forth sufficient grounds to warrant a hearing.

### B. The Evidence Is Merely Cumulative and Impeaching

¶ 161 Even if the NAS Report constitutes new evidence, Genrich must show that it is "material to the issues involved, and not merely cumulative or impeaching." *People v. Rodriguez*, 914 P.2d 230, 292 (Colo. 1996).

### 1. *Farrar* and the Definition of Material

¶ 162 In *Farrar*, the supreme court explained that to be material, new evidence "must be of sufficient consequence for reasons other than its ability to impeach, or cast doubt upon, the evidence already presented at trial." *Farrar*, 208 P.3d at 707. To be consequential, the court continued, the evidence must be "affirmatively probative of the defendant's innocence, whether that is accomplished by helping to demonstrate that someone else probably committed the crime; that the defendant probably could not have committed the crime; or even that the crime was probably not committed at all." *Id.*

¶ 163    Both of my colleagues conclude that *Farrar* has no application here.  Specifically, they conclude that though the supreme court announced this language, it did not apply it.  I respectfully disagree.

¶ 164    After providing this guidance on what materiality means in the context of new evidence, the court reiterated, "we have for some time emphasized that a defendant can be entitled to a new trial as the result of newly discovered evidence only if that evidence would be likely to result in acquittal for reasons beyond simply impeaching the earlier conviction."  *Id.*  In the context of that case, which involved a witness recantation, the court stated that a new trial would not be warranted "[u]nless the victim's testimony *that the defendant did not commit the sexual assault* will probably be believed."  *Id.* at 708 (emphasis added).  Clearly, this is an invocation of the "affirmatively probative of innocence" test the court had announced appearing just moments before.  The court further stated that the district court "properly evaluated the effect of the victim's recantation apart from its impeachment value."  *Id.* at 709.  And finally, the court reiterated that a new trial may only be granted "upon the discovery of *meaningfully contradictory* evidence."  *Id.* (emphasis added).  There is simply no reason to believe that

"meaningfully contradictory" was meant to be read in the context of the test for "sufficient consequence" or materiality appearing just three pages earlier in the court's decision.

¶ 165    Judge Berger seeks to distinguish *Farrar* on two additional grounds, both of which I disagree with. First, he posits that *Farrar* itself disavows any effort to impose a heightened standard when it discusses the test for withdrawing a guilty plea based on new evidence set forth in *People v. Schneider*, 25 P.3d 755 (Colo. 2001). *Supra* ¶¶ 110-111 (Berger, J., specially concurring). Judge Berger states that the existing standard for obtaining a new trial differs from the test for withdrawal of a guilty plea based on new evidence only because the latter requires proof that the charges be "actually false or unfounded." *Schneider*, 25 P.3d at 762. However, I do not believe the *Farrar* standard is an "actual innocence" test. To require a defendant to prove — as a threshold to being permitted to withdraw a plea — that the charges were actually false is far different than to require a defendant to prove — as a threshold for obtaining a new trial — that evidence is "affirmatively probative of innocence." The latter only requires a threshold showing that the charges *might* actually be false or unfounded. Thus, *Schneider* does

not necessitate any limitation on the clarification of the materiality test announced in *Farrar*.

¶ 166 Next, Judge Berger asserts that to the extent *Farrar* imposes a new test for materiality, that test is limited to recantations. I do not believe this is a fair reading of the case.

¶ 167 When the supreme court set forth its clarification of what is required for new evidence to be consequential, it had not yet turned to the analysis of the specific facts of the case; rather, it was setting forth the applicable law. *Farrar*, 208 P.3d at 706-07. In doing so, the court discussed the historical treatment of the materiality prong of the test by referring to two cases, neither of which is a recantation case. *Id.* (first citing *People v. Scheidt*, 187 Colo. 20, 22, 528 P.2d 232, 233 (1974); then citing *Digiallonardo v. People*, 175 Colo. 560, 567, 488 P.2d 1109, 1113 (1971)).

¶ 168 The new evidence in *Scheidt* involved an allegation that before the defendant's trial, the prosecution possessed but did not disclose a statement by a different person confessing to the killing for which the defendant had been convicted. 187 Colo. at 21, 528 P.2d at 233. No witness recanted any testimony.

¶ 169    The new evidence in *Digiallonardo* involved a post-trial statement from the victim of a robbery by two men he had just been introduced to, in which the victim stated that at some point after the trial, he had seen the defendant and another man at a social event, and "in viewing the two men he now feels that his absolute identification of defendant . . . is doubtful and that his testimony may have been mistaken."  175 Colo. at 567, 488 P.2d at 1113. While this statement might be classified as a recantation, even the court was hesitant to do so, stating that the witness "merely states that he may have been mistaken."  *Id.* at 569, 488 P.2d at 1114. Such a statement does not amount to the witness withdrawing or renunciating his testimony.  *See* Black's Law Dictionary 1521 (11th ed. 2019) (defining recant).[3]

¶ 170    Finally, after setting forth the law in this area, the supreme court in *Farrar* noted that "[n]ewly discovered evidence in this sense *can, and often does*, arise from the recantation of a witness who testified at trial."  *Farrar*, 208 P.3d at 707 (emphasis added).  The court further explained that "some jurisdictions treat recantations

---

[3] Interestingly, in both cases, the supreme court affirmed the trial court's denial of a new trial.

as a distinct ground for ordering a new trial, subject to different standards of proof altogether." *Id.* However, the court stated that it has "never singled out recantation for this kind of special treatment." *Id.* In short, nothing in the court's discussion suggests that recantation is to be treated differently than any other type of new evidence.

### 2. The Materiality of the NAS Report

¶ 171  Nothing in the NAS Report demonstrates, or even suggests, that Genrich did not commit the crimes, or that someone else probably did.[4] The evidence demonstrates nothing more than that, after Genrich's trial, a consensus has developed in a significant portion of the scientific community that agrees with Genrich's expert's view of the state and quality of the forensic science of toolmark identification. Similarly, nowhere in Siegel's original affidavit does he state that the examiner's opinion in this case was definitively wrong. Rather, Siegel only opines that there is no scientific support for the examiner's opinion — a point unequivocally made to the jury by Genrich's trial expert.

---

[4] Of course, there can be no argument in this case that the crime did not actually occur.

¶ 172    In other words, the NAS Report shows nothing more than that additional experts would support Genrich's trial expert and refute the prosecution's. Therefore, the information in the report is not material — i.e., not sufficiently consequential; rather, the evidence is merely cumulative of Genrich's trial expert's testimony and serves only to impeach the prosecution's expert. Genrich's allegations, taken as true, fail to establish the third prong of the test as well. Thus, because he would not be entitled to relief, he is not entitled to a hearing.

### C. The Record Clearly Demonstrates that the Evidence Would Probably Not Produce an Acquittal

¶ 173    Finally, again assuming the NAS Report qualifies as new evidence, the record as a whole clearly demonstrates that the evidence would probably not produce an acquittal. First, unlike my colleagues, I am not convinced that the NAS Report would necessarily exclude much, if any, of the toolmark examiner's testimony, the vast majority of which was informed by his own extensive personal experience from sixteen years examining toolmarks. *See Kutzly v. People*, 2019 CO 55, ¶ 17 (holding that experience-based expert testimony need not always be based on

statistical analysis).  Indeed, Judge Harry Edwards, the co-chair of the committee that authored the NAS Report, has made it clear that "nothing in the Report was intended to answer the 'question whether forensic evidence in a particular case is admissible under applicable law.'" *United States v. Rose*, 672 F. Supp. 2d 723, 725 (D. Md. 2009) (quoting Hon. Harry T. Edwards, Statement before U.S. Senate Judiciary Committee (Mar. 18, 2009)).

¶ 174    Yet, even if the individualization testimony were excluded, the jury would nevertheless have heard testimony from a very experienced toolmark examiner that the toolmarks on the bomb parts were consistent with marks made by Genrich's tools.  (It bears repeating that nothing in the NAS Report or Genrich's motion refutes the accuracy of that testimony.)  Combined with the weighty circumstantial evidence of Genrich's guilt, the probability that the individualization testimony was the linchpin of the jury's deliberation appears quite low.[5]

---

[5] I note that Genrich has not identified any case in which the 2009 NAS Report was determined to be sufficiently material new evidence regarding toolmark analysis that a new trial was ordered.  And, despite a nationwide search, I have discovered no such case.

## IV. Genrich's Due Process Claim

¶ 175   Genrich also claims that permitting a conviction to stand despite the fact that some of the scientific testimony supporting that conviction has fallen out of favor would run afoul of his due process rights. While I do not necessarily disagree with his premise, I do not believe he has sufficiently pleaded facts to warrant a hearing on the issue.

¶ 176   Some federal courts have considered a defendant's due process claim based on subsequently debunked scientific testimony.

¶ 177   In *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015), the defendant was convicted of murder and arson, based in part on the testimony of an expert in fire science. *Id.* at 161. During a postconviction hearing, the defendant presented "evidence about developments in the field of fire science that . . . 'provided ample reason to question the reliability of the arson investigation.'" *Id.* (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 401 (3d Cir. 2012)). The defendant then filed a habeas corpus petition, claiming that his conviction violated due process because it was based on inaccurate and unreliable evidence. *Id.* at 162. The Third Circuit Court of

Appeals held that, to prevail, the defendant "must show that the admission of the fire expert testimony undermined the fundamental fairness of the entire trial because the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Id.* (quoting *Glunt,* 667 F.3d at 403). However, habeas relief is not available where there is "ample other evidence of guilt." *Id.* (quoting *Glunt,* 667 F.3d at 407 n.13).

¶ 178    In *Gimenez v. Ochoa,* 821 F.3d 1136 (9th Cir. 2016), the Ninth Circuit Court of Appeals reviewed a challenge to a child abuse conviction based on testimony regarding the connection between a specific triad of injuries (subdural hematoma, brain swelling, and retinal hemorrhage) and a diagnosis of Shaken Baby Syndrome (SBS). *Id.* at 1143. The defendant pursued habeas relief, asserting that numerous scientific articles published following his conviction had altered the reliance of the forensic pathology community on this triad, and that now the medical community requires some evidence of impact injuries before diagnosing SBS. *Id.* The Ninth Circuit Court of Appeals adopted the test adopted by the Third

Circuit in *Han Tak Lee*. *Id.* at 1145. However, the court denied habeas relief based on the strength of the remaining evidence. *Id.*

¶ 179 I note that neither the Colorado Supreme Court nor the Tenth Circuit Court of Appeals has adopted the *Han Tak Lee* test. However, even if I assume that a due process challenge to a conviction based on subsequently discredited science is cognizable in theory, such a claim would not be applicable here.

¶ 180 The flaw in Genrich's proposition is not in its premise, but in the applicability of that premise to his situation. He formulates the issue in his opening brief: "Is Due Process violated where *the sole evidentiary basis* for conviction is expert testimony that is later *revealed to be patently false and contrary to science*?" (Emphasis added.) As both Judge Berger and I have pointed out, the individualization testimony at trial is far from the sole evidentiary basis for the conviction. *Supra* ¶ 131 & n.6 (Berger, J., specially concurring). While the weight and sufficiency of the circumstantial evidence of Genrich's guilt might be subject to debate, its existence is not, notwithstanding Genrich's counsels' refusal to acknowledge it. Further, as I have discussed, nothing in either the NAS Report or the Siegel affidavit supports the allegation that the toolmark

analysis testified to at trial is either "patently false" or "contrary to science." Again, the only conclusion of the report is that more testing is needed to ensure reliability.

¶ 181 Again, I do not reject the premise underlying *Han Tak Lee* — that a conviction that rests exclusively, or even primarily, on scientific testimony that is later determined to be demonstrably false cannot stand. This, however, is not that case. Even if the *Han Tak Lee* test were applicable, Genrich fails to satisfy it, or even sufficiently invoke it to be entitled to a hearing. He has not alleged facts that would demonstrate that the admission of the individualization testimony at trial undermined the fundamental fairness of the trial, particularly in light of (1) the fact that his expert witness exposed all of the same flaws in the testing that the NAS Report later identified and (2) the strength of the remaining evidence against him.

## V. Conclusion

¶ 182 I concur in the decision affirming the district court's denial of the request for a new trial on the non-class-1 felony charges. But because — taking as true all of Genrich's factual allegations — I do

not believe he has brought forth new material evidence that would likely result in acquittal, I respectfully dissent from the decision to require the district court to conduct a hearing on Genrich's motion for new trial.